**NOT FOR PUBLICATION**

<table>
<tr><td>
UNITED STATES BANKRUPTCY<br>
COURT DISTRICT OF NEW JERSEY<br>
<strong>Caption in Compliance with D.N.J.<br>
LBR 9004-1(b)</strong>
</td><td rowspan="5">
Lead Case No. 25-16984<br><br>
Adv. Case No. 26-01018 (MBK)<br><br>
Hearing Date: March 18, 2026<br><br>
Chapter 11
</td></tr>
<tr><td>
In Re:<br>
Del Monte Foods Corporation II, Inc., <em>et al.</em>,<br><br>
Debtors.
</td></tr>
<tr><td>
Certain Members of the Ad Hoc Group of<br>
Minority Secured Lenders,<br><br>
Plaintiffs,<br><br>
v.<br><br>
Members of the Ad Hoc Term Lender Group,<br><br>
Defendants.
</td></tr>
</table>

*All Counsel of Record*

## MEMORANDUM DECISION

Presently before this Court is a Motion for Dismissal of the Ad Hoc Group of Minority Secured Lenders' (the "Plaintiffs") Adversary Complaint (hereinafter, the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b) (the "Motion to Dismiss") filed on behalf of the Ad Hoc Term Lender Group (the "Defendants" or "Movants") (ECF No. 5[1]). Ultimately, Defendants seek dismissal of Plaintiffs' Complaint on the grounds that the claims asserted therein are without merit, and further request that the Court enter

---

[1] Unless otherwise indicated, ECF Nos. will refer to entries made in the Adversary Proceeding docket.

an order dismissing the complaint with prejudice. The Court has reviewed carefully the Complaint, the parties' written submissions, as well as arguments made during the hearing held on March 16, 2026. For the reasons that follow, the Court will **GRANT** in part and **DENY** in part the Motion to Dismiss.

## I.    Jurisdiction

The Court has jurisdiction over the contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984—as amended September 18, 2012, and June 6, 2025—referring all bankruptcy cases to the bankruptcy court. This matter is a statutory core proceeding, and this Court has constitutional authority to enter a final order. 28 U.S.C. § 157(b)(2) [2].

## II.    Background[3]

### A.  The Super-Senior Credit Facility[4] (the "__Pre-petition Loan Agreement__[5]")

On August 2, 2024, as part of a "drop down" liability management transaction, Debtors transferred substantially all of its assets to DM Intermediate Corporation, which in turn transferred those assets to a newly formed unrestricted subsidiary, DM Intermediate II Corporation; those assets were then further transferred to a second newly formed unrestricted subsidiary, Del Monte Foods Corporation II Inc. *Adv. Compl.* ¶ 11, ECF No. 1. On the same day, Del Monte Foods Corporation II Inc., as borrower, and DM Intermediate Corporation, together with certain

---

[2]  For purposes of this Motion, the Court accepts, without further analysis, the Plaintiffs' admission in paragraph 9 of the Complaint that the within dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). *Adv. Compl.* ¶ 9.

[3] Given the breadth and complexity of the Lead Case, this section is limited to the factual and procedural history relevant to the Adversary Complaint and the instant Motion to Dismiss.

[4] Formally known as the "Super-Priority and Guaranty Agreement".

[5] Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Adversary Complaint and moving papers.

subsidiaries, as Guarantors, then entered into the Pre-petition Loan Agreement[6]. *Adv. Compl.* ¶ 12;

*Defendants' Motion*, Ex. A., 33 ("*Super-Priority Credit and Guaranty Agreement*"), ECF No. 5-2.

The Pre-petition Loan Agreement provided for three tranches of term loans: (i) the First Out Term

Loan totaling $236 million (the "First Out Term Loan"); (ii) the Second Out Term Loan totaling

$468.8 million (the "Second Out Term Loan"), and the Third Term Out Loan totaling $135 million

(the "Third Out Term Loan," and collectively, the "Term Loans"). *Id*. The Term Loans were

secured by a first-priority lien on Term Loan Priority Collateral, and a second priority lien on asset-

based lending Priority Collateral. *Id*.

Section 2.15 of the Pre-petition Loan Agreement titled "Application of

Prepayments/Reduction", contains a "payment waterfall" provision (the "Waterfall Provision")

which sets forth the order of priority for distribution of payments and proceeds from Del Monte

Foods Corporation II Inc., as borrower, to the lenders. *Adv. Compl.* ¶ 15. This provision makes

clear that all Lenders of the First Out Term Loan shall be repaid in accordance with the Waterfall

Provision. *Id*.

Foundational to Plaintiffs' argument is Section 2.17 (the "Sharing Provision"), which

states:

> **2.17. Ratable Sharing.** Lenders hereby agree among themselves that if any of them
> shall, whether by voluntary payment (other than a voluntary prepayment of Loans
> made and applied in accordance with the terms hereof), through the exercise of any
> right of set-off or banker's lien, by counterclaim or cross action or by the
> enforcement of any right under the Credit Documents or otherwise, or as adequate
> protection of a deposit treated as Cash Collateral under the Bankruptcy Code,
> receive payment or reduction of a proportion of the aggregate amount of principal,
> interest, fees and other amounts then due and owing to such Lender hereunder or
> under the other Credit Documents (collectively, the **"Aggregate Amounts Due"** to
> such Lender) which is greater than the proportion received by any other Lender in
> respect of the Aggregate Amounts Due to such other Lender, then the Lender

---

[6] As set forth in Section 10.14, the Pre-petition Loan Agreement is governed by, and construed in accordance
with the laws of the State of New York (as well as all other applicable agreements referenced in the
Adversary Complaint). *Adv. Compl*. ¶ 14.

receiving such proportionality greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them . . .

*Defendants' Motion*, Ex. A., 102 (*"Sharing Provision § 2.17"*), ECF No. 5-2. Moreover, the Sharing Provision expressly states three exceptions:

The Provisions of this Section 2.17 shall not be construed to apply to (a) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it or (c) any payment of any fee in connection with any amendment, waiver or consent or in connection with any extension or commitment of funds.

*Id*. Pursuant to Sections 10.5(b) and 10.5(c), the Sharing Provision cannot be amended, modified, or waived without the consent of each Lender directly and adversely affected; accordingly, Plaintiffs maintain that this language renders Section 2.17 a so-called "sacred right." *Adv. Compl.* ¶ 17.

### B. Intercreditor Agreements

On August 2, 2024, the parties to the Pre-petition Loan Agreement entered into a Pre-petition intercreditor agreement (the "Intercreditor Agreement"), which, among other things, provides for how proceeds of senior collateral under the Pre-petition Loan Agreement will be applied. *Adv. Compl.* ¶ 18; *Defendants' Motion*, Ex. A, 364 (*"Intercreditor Agreement"*) § 4(a), ECF No. 5-2. Moreover, section 5.3(c) of the Intercreditor Agreement provides that even in the case of insolvency, the existing Lien Priority and other terms and conditions set forth in the Intercreditor Agreement still control. *Adv. Compl.* ¶ 19. Additionally, parties to the Pre-petition Loan Agreement entered into a Pre-petition "Pari Passu" intercreditor agreement, which provides

4

that proceeds from any collection, sale, and foreclosure related to proceeds of collateral under the Pre-petition Loan Agreement shall be paid to first priority obligations after payment of obligations owed to each applicable administrative agent and collateral agent. *Adv. Compl.* ¶¶ 20-21; *Defendants' Motion*, Ex. A, 382-83 ("*Pari Passu Agreement*") § 4.1(a), ECF No. 5-2.

### C.  Amendment No. 1 to the Super-Priority Credit and Guaranty Agreement

A group of Lenders that did not join the Pre-petition Loan Agreement—led by Black Diamond (the "2024 Holdouts")—retained $105 million of stub 2022 Term Loans owed by Debtors. *Adv. Compl.* ¶ 22. In the fall of 2024, those 2024 Holdouts re-constituted the boards of Del Monte and certain parent entities and commenced litigation seeking determination that the new directors were properly installed. *Id*. After trial on the merits, but before the Delaware Chancery Court ruled, Debtors settled with the 2024 Holdouts by agreeing to pay their stub 2022 Term Loans in full. *Id*. In order to raise money to make settlement payment, Debtors and other borrowers under the Pre-petition Loan Agreement incurred an additional $122,100,000 of Incremental First Out Term Loans in April 2025 pursuant to Amendment No. 1 to the Super-Priority Credit and Guaranty Agreement dated April 8, 2025 (the "Amendment"). *Adv. Compl.* ¶ 23. The additional term loans were backstopped and funded by members of the Majority Ad Hoc Group (the Defendants) who hold more than $107 million of Incremental First Out Term Loans. *Id*[7].

The option to participate in the Incremental First Out Term Loans was offered to all existing Lenders under the Pre-petition Loan Agreement based upon their pro rata share of the First Out Term Loan under the Pre-petition Loan Agreement and following entry into the Amendment, the

---

[7] The "*Amendment No. 1*" was not annexed to the exhibits accompanying the Motion to Dismiss, nor was it included with any related submissions. For reference however, and as reflected in the Adversary Complaint, Plaintiffs cite to Section 1(a)(i) of the Amendment.

First Out Term Loans were upsized to a total funded amount of $395,000,000. *Adv. Compl.* ¶¶ 25-26. The Defendants opted to participate in the Incremental First Out Term Loans. *Adv. Compl.* ¶ 28.

### III.    Nature of Action and Procedural History

On July 1, 2025, after undergoing a period of financial crisis, Del Monte Foods Corporation II, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Del Monte") sought relief under Chapter 11 of the Bankruptcy Code, assigned case number 25-16984 (the "Bankruptcy Case" or "Lead Case"). To remain in business during the Chapter 11 process and to maximize the value of the estates as it operated during its sale process, the Debtors required interim financing. As a result, the Defendants agreed to extend credit to support the Debtors during its reorganization and, under the court-approved debtor-in-possession loan agreement (the "DIP Loan"), the Defendants converted a portion of their pre-petition debt into "roll-up loans" in exchange for enhanced priority (the "Roll-Up Loans"). All creditors of the same class and similarly situated were afforded an equal opportunity to participate in the debtor-in-possession financing on the stated terms. Plaintiffs declined to participate and therefore retained their pre-petition position—holding the same debt with the same priority as existed prior to the chapter 11 filing.

On January 23, 2026, Plaintiffs filed the instant Adversary Proceeding alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and seeking a declaratory judgment.  Plaintiffs assert that their claims against the Defendants accrued upon entry of the *Final Order (I) Authorizing the Debtors to (A) Obtain Post-petition Financing and (b) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, and (V) Granting Related Relief* (the "Final DIP Order") (ECF No. 359 in the Lead Case, Case No. 25-16984). Specifically, Plaintiffs contend

that, under the Final DIP Order, Defendants reduced certain pre-petition debt in exchange for the Roll-Up Loans, in violation of the Pre-petition Loan Agreement (described in further detail below), under which both Plaintiffs and Defendants (collectively the "Parties") were lenders. *Adv. Compl.* ¶ 2. Accordingly, Plaintiffs maintain that Defendants failed to comply with the Sharing Provision set forth in Section 2.17 of the Pre-petition Loan Agreement. *Id.* ¶ 3.

On February 25, 2026, Defendants filed the instant Motion to Dismiss Plaintiffs' Complaint (ECF No. 5). Thereafter, on March 11, 2026, Plaintiffs filed a brief in opposition to Defendants' Motion (the "Opp.") (ECF No. 12). Subsequently, on March 16, 2026, Defendants filed a response in further support of their Motion (the "Reply") (ECF No. 16). After considering the Parties' submissions and oral arguments, the Court held the matter on reserve.

## IV.   Legal Standard

Defendants filed this Motion pursuant to FED. R. CIV. P. 12(b)(6), for failure to state a claim, applicable to adversary proceedings pursuant to FED. R. BANKR. P. 7012. Under Rule 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual allegations, taken as true, to 'state a claim for relief that is plausible on its face.'" *Fleishner v. Standard Ins.*, 679 F.3d 116, 120 (3d Cir. 2012) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion under FED. R. CIV. P. 12(b)(6), a court must "view the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff, and judgment should not [be] granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law." *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002) (citation omitted); *see also Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). A claim has "facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly* at 556).

To test sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the Court must conduct a three-step inquiry. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130-31 (3d Cir. 2010).

> First, the court must tak[e] note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Santiago*, 629 F.3d, 121 at 130 (quotations omitted).

## V.   Motion to Dismiss

### A.  Count I

In Count I, Plaintiffs argue that Defendants breached the Pre-petition Loan Agreement at the time the Roll-Up Loans were approved by this Court because the Final DIP Order converted a portion of the First Out Term Loan into super-priority loans. *Adv. Compl*. ¶ 42. This, according to Plaintiffs, reduced Defendants' Pre-petition First Out Term Loan indebtedness without abiding by the express terms of the Sharing Provision in the Pre-petition Loan Agreement. *Id*.  Plaintiffs maintain that Defendants—through their conduct—are essentially depriving Plaintiffs of their so-called "sacred right" to ratable treatment in loan repayment. *Id*.  And, under the terms set forth in the Pre-petition Loan Agreement, Plaintiffs argue they are entitled to share pro rata in any "payment or reduction" of the debt that Debtors owe under the agreement. Therefore, Plaintiffs argue Defendants have violated their contractual obligations to Plaintiffs by allegedly receiving payment on their debt, through participation in the DIP Loan, without permitting Plaintiffs to share ratably in that recovery. The Court finds Plaintiffs' reading of the Pre-petition Loan Agreement unpersuasive.

8

In matters concerning contract interpretation, "a bankruptcy court will 'rely on applicable state law in construing a contract's terms.'" *In re Fresh-G Rest. Intermediate Holding, LLC*, 580 B.R. 103, 108-09 (Bankr. D. Del. 2017) (quoting *In re New Century TRS Holdings, Inc.*, No. 07-10416 KJC, 2011 WL 1811050, at *2 (Bankr. D. Del. May 10, 2011)). The parties agree that the governing documents require application of New York law.  "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014). To properly plead a breach of contract claim, a litigant must establish "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of contract, and resulting damages." *See Tapp Partners, LLC v. Wall Sections Inc.*, 244 A.D.3d 1727, 1728 (4th Dept 2025) (quoting *Niagara Foods, Inc. v. Ferguson Elec. Serv. Co., Inc.*, 111 A.D.3d 1374, 1376 (4th Dept 2013)). As will be discussed, in the present matter, there have been no breaches by Defendants of any obligations under the Pre-petition Loan Agreement, and thus, Plaintiffs' breach of contract claim fails as a matter of law.

The Sharing Provision set forth in Section 2.17 of the Pre-petition Loan Agreement requires that if any Lender receives "payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender [under the Pre-petition Loan Agreement] or under the other Credit Documents (collectively, the "Aggregate Amounts Due") which is greater than the proportion received by any other Lender," such Lender shall "apply a portion of such payment to purchase participations . . . in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them." *Adv. Compl.* ¶ 40; *Pre-petition Loan Agreement* § 2.17. Plaintiffs further assert that under Section 10.5(b)(viii) and Sections

9

10.5(c)(iii), (c)(v), and (c)(vi) of the Pre-petition Loan Agreement, Section 2.17 cannot be amended, modified, or waived without the consent of each Lender directly and adversely affected thereby, thus making Section 2.17 a so-called "sacred right". *Adv. Compl.* ¶ 17; *Plaintiffs' Opp.* 4.

At its core, Plaintiffs' Complaint is bottomed on an interpretation of the Pre-petition Loan Agreement such that Defendants' mere participation in and negotiation of a DIP loan which includes a roll-up of pre-petition debt, without more, constitutes a "payment or reduction" as defined in Section 2.17, and that by participating in the roll-up loan transaction, Defendants have deprived Plaintiffs of their "sacred right" to ratable treatment. As a result, Plaintiffs contend they are entitled to recover from the ratable share. *Plaintiffs' Opp.* 14.

The Court disagrees with Plaintiffs' view as to the impact of the DIP transaction and whether the negotiated roll-up mechanism, in and of itself, triggers any sharing obligations under the Pre-petition Loan Agreement. Under the DIP Loan, Defendants provided $165,000,000 in new money loans in exchange for enhanced priority on $247,500,000 of "rolled-up" pre-petition debt. *Defendants' Motion*, 4. The DIP Loan granted the Defendants priority through the Roll-Up Loans, which converted the $247,500,000 in pre-petition debt into an equivalent amount of "super-priority DIP obligations." *Id*. In simple terms, Defendants agreed to loan $165,000,000 in new money, but only if they could recover $247,000,000 before anyone else were to receive payment on pre-petition indebtedness. By means of the roll-up, Defendants secured a strengthened position as to their pre-petition debt in exchange for undertaking the meaningful risks associated with new money loans.

Neither Debtors' new post-petition loan obligations, nor the resulting improved treatment of Defendants' pre-petition loans, constitute a "payment" or "reduction" of debt for purposes of the Sharing Provision, as the transactions did not involve the discharge of any debt. It is well-

10

settled "that a mere promise to pay, absent an express agreement to the contrary, does not discharge a preexisting debt." *Manufacturers and Traders Trust Co. v. Myers*, 38 A.D.3d 965, 965-966, (3d. Dept 2007) (citations omitted); *see also Skaneateles Savings Bank v. Herold*, 50 A.D.2d 85, 88-89 (4th Dept 1975) (holding that, absent "an express understanding" to the contrary, a promissory note is ordinarily "evidence of a debt rather than in payment thereof"). The Debtors and Defendants engaged in a cashless exchange in which Debtors secured additional financing by undertaking new post-petition obligations and agreeing to improved treatment of Defendants' pre-petition claims. The Court's entry of the Final DIP Order did not result, in any way, in a payment, satisfaction or reduction of principal, interest, fees or other amounts due and owing under the Pre-petition Loan Agreement.

The Court's view is supported by the well-settled principle that "[a]bsent express language to the contrary, in [a] typical credit agreement the term 'payment' is most sensibly construed to apply only to payments received in cash." Michael Bellucci & Jerone McCluskey, *The LSTA's Complete Credit Agreement Guide* 526 (2d Ed. 2017); *see also Stokes v. Stokes*, 34 A.D. 423, 431-32 (1st Dept 1898) (stating that a payment is "the discharge in money of a sum due").

Likewise, other provisions of the Pre-petition Loan Agreement further support the Court's conclusion. For example, Section 2.16(a) makes clear that "[a]ll payments by the Borrower of principal, interest, fees and other Obligations *shall be made in Dollars* in the same day funds." *Pre-petition Loan Agreement* § 2.16(a) (emphasis added). Section 2.16(c) requires an administrative agent to "promptly distribute to each Lender . . . all payments . . . of principal and interest due hereunder." *Id*. § 2.16(c). It is evident to the Court that the Parties thus understood "payment" to require an exchange of dollars or cash equivalents and, as the Defendants argue, the obligation to "distribute" such "payments" would make little sense in the context of a cashless

11

exchange, as occurred when Defendants participated in the roll-up loan transaction. *Defendants'*
*Motion*, 10; *see Ellington,* 24 N.Y.3d at 342; *Home & City Sav. Bank v. Bilinski*, 177 A.D.2d 73,
75 (3d Dept 1992) (holding that delivery of a promissory note and the "consolidation of it with
other loans" generally does not constitute satisfaction of a debt) [8]. Here, the roll-up transaction
did not discharge a single dollar of the Debtors' existing payment obligations to Defendants. *Final*
*DIP Order*, 4.

The Plaintiffs cite *Sumitomo Mitsui Banking Corp. v. Credit Suisse*, 89 A.D.3d 561 (1st
Dept 2011) in support of their contention that the Roll-Up Loans were a "payment or
reduction." *Plaintiffs' Opp.* 8. Indeed, *Sumitomo* instructs courts to look beyond the labels used in
supporting documentation because "it is the economic substance of a transaction that should
determine the rights and obligations of interested parties." *Sumitomo*, 89 A.D.3d at 564. However,
implicit in this direction is that the "economic substance"—and resulting "rights and obligations
of interested parties"—must be evaluated in the context of the parties' written agreement. *Id.; see*
*also, e.g.*, *Ellington*, 24 N.Y.3d at 244, 251-53. Moreover, New York courts have addressed
previously the "economic substance" of additional debt, ruling that—absent a written agreement
to the contrary—the giving of a note is not equivalent to the payment of money, but rather, is
construed "as evidence of a debt." *Skaneateles*, 50 A.D.2d at 88-89 (quoting *Industrial Bank of*
*Commerce v. Shapiro*, 276 A.D. 370, 372 (1st Dept 1950)); *Bilinski*, 177 A.D.2d at 75; *In re Earl*,
147 B.R. 60, 63 (Bankr. N.D.N.Y. 1992).

---

[8] The caselaw cited by Plaintiffs are distinguishable. *See, e.g., AEA Middle Market Debt Funding LLC v.*
*Marblegate Asset Mgmt., LLC*, 214 A.D.3d 111, 129 (1st Dept 2023) (involving a credit bid as opposed to
new debt); *Prudential Ins. Co. of Am. V. WestLB AG*, 961 N.Y.S.2d 360 at *2, *3 (Sup. Ct. 2012) (explaining
that a ratable sharing provision could be applied to proceeds from a collateral sale in the face of allegations
that a lender abused its position to manipulate a sale of collateral assets through a credit bid and later resale).
Defendants argue that neither case supports "the principle that a debt-for-debt conversion occurring as part
of an offering of new money constitutes a "payment" or "reduction" of debt. *Defendants' Motion*, 7.

Here, the Parties' agreement indisputably contains *no* express provision establishing that a roll-up would constitute "payment" or "reduction" of the pre-petition debt or give rise to any obligations under the Sharing Provision. As set forth above, where contract terms are clear and unambiguous, courts may not construe or "rewrite" the contract in a way that contradicts its express terms. *Sutherland Glob. Servs., Inc. v. Crowley*, 21 Misc. 3d 344, 347 (Sup. Ct. 2008). This principle is especially applicable when construing contracts between "sophisticated, counseled businessmen, and the undisputed evidence show[s] that the unambiguous language reflect[s] precisely what the moving part[ies] intended." *Chimart Associates v. Paul*, 66 N.Y. 2d 570, 574 (1986). Simply put, had the Plaintiffs intended the agreement to prohibit a roll-up arrangement or to treat it as payment of the pre-petition debt, the parties could have stated so expressly. *Defendants' Motion*, 10; *see, e.g., CT Inv. Mgmt. Co., LLC v. Chartis Specialty Ins. Co.*, 130 A.D.3d 1, 7 (1st Dept 2015).

Plaintiffs further direct the Court's attention to Judge Craig Goldblatt's decision in *In re Am. Tire Distributors, Inc.*, 24-12391 (Bankr. D. Del. Nov. 12, 2024) to reinforce their contention that participation in the roll-up transaction cannot be used to sidestep pro rata sharing obligations among lenders and that by structuring the transaction to benefit certain lenders at the expense of others, the Defendants are employing financing mechanisms to evade contractual obligations. *Plaintiffs' Opp*, 12; *Sklar Decl.*, Ex. 4, Hrg. Tr. 116:2-9; 116:13-16, 122:20-21, ECF No. 12-5. However, Plaintiffs' characterization of Judge Goldblatt's decision omits essential parts of the court's explanation. Specifically, when the court learned that the roll-up transaction in *American Tire* did not involve a payment, but rather a cashless conversion of debt—which consequently caused a subordination issue with the parties—Judge Goldblatt acknowledged "it might be more complicated than my gut-level reaction . . . I was thinking of it under the structure . . . of the way

I grew up understanding what a rollup was." *Plaintiffs' Opp.*, *Sklar Decl.*, Ex. 4, Hrg. Tr. 122:13-17. Ultimately, Judge Goldblatt did not make a definitive ruling on whether the roll-up transaction, in and of itself, violated the DIP Loan, given the nature of the exchange of debt[9]. *See, e.g.* Hrg. Tr. 122:23-24 (suggesting that "if and when [a lawsuit challenging the roll-up] is filed, we'll deal with it"); *Id.* at 123:5-6, 128:10-14.

Finally, were this Court to accept the proposition that the mere entry into a DIP facility, which includes a roll-up of pre-petition obligations, should qualify as a "payment" or "reduction of indebtedness" for purposes of enforcing the Sharing Provision of the Pre-petition Loan Agreement, Defendants would face the unreasonable prospect of having to purchase the requisite loan participation, in the "Aggregate Amounts Due to the other Lenders" [per the Sharing Provision] with no guarantee that the DIP Loan would in fact be repaid[10]. This Court, as well as my colleagues in other districts, have witnessed first-hand the unfortunate reality that DIP loans are not always satisfied in full or even meaningful part. Indeed, the additional fees, charges, priming considerations and enhanced treatment of pre-petition loans through roll-ups are intended to compensate lenders for such increased risks of nonpayment. It is nonsensical to suggest that the non-participating lenders, such as Plaintiffs, should secure the benefit of payment on their pre-petition loans, having taken no such risks, merely upon the entry of the Final DIP Order.

Accordingly, Count I of the Adversary Complaint is dismissed with prejudice.

---

[9] While Judge Goldblatt agreed that the minority lenders may prevail in a litigation challenging the non-pro rata roll-up transaction as a violation of the terms set forth in the prepetition first lien loan, the court's analysis centered on whether there was an actual pay-down of the pre-petition debt. *See Plaintiffs' Opp. Sklar Decl.*, Ex. 4, Hrg. Tr. at 116:6-9.

[10] At the time of oral argument and the submission of briefing on the Motion, there had not been a closing on the approved sales of the Debtors' assets, and no proceeds to satisfy all or a portion of the DIP Loan. The Court understands that subsequently, the sales did, in fact, close and at least a portion of the DIP Loan has been repaid. This has no bearing on the Court's ruling on Count I.

14

## B. Count II

In Count II, Plaintiffs allege Defendants breached the implied covenant of good faith and fair dealing when Defendants "improperly circumvented" Plaintiffs' "sacred rights", as well as duties and obligations imposed upon Defendants under the Pre-petition Loan Agreement. *Adv. Compl.* ¶ 47. Additionally, Plaintiffs contend that by entering into the DIP Loan, Defendants employed a "scheme" to bypass Plaintiffs' rights under the Pre-petition Loan Agreement. *Id.* ¶ 48. Under principles of New York law, "[i]mplicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included." *Wymara, Ltd. V. Gansevoort Hotel Grp., LLC*, 241 A.D.3d 1611, 1613 (2d Dept 2025) (citations omitted). The implied covenant of good faith and fair dealing obligates each party to a contract to refrain from conduct that would undermine or deprive the other party of the benefits reasonably expected under the agreement, even where such conduct is not expressly proscribed by the contract's terms. *Id.* However, "no obligation may be implied that would be inconsistent with other terms of the contractual relationship." *Id.* (citing *Celauro v. 4C Corp.*, 187 A.D.3d 836, 838 (2d Dept 2020); *1357 Tarrytown Rd. Auto, LLC v. Granite Props., LLC*, 142 A.D.3d 976, 977 (2d Dept 2016)). "A court, under the guise of interpretation, may not imply a provision the parties chose to omit." *Id.* (citing *Ernst v. Ernst*, 8 A.D.3d 331, 332 (2d Dept 2004)). Here, Plaintiffs have not sufficiently pled a claim for breach of implied covenant of good faith and fair dealing.

Germane to the issue is Plaintiffs' belief that Defendants devised an improper scheme in an attempt to nullify Plaintiffs' rights under Sections 2.17, 10.5(b)(viii), and 10.5(c)(iii), (c)(v), and (c)(vi) of the Pre-petition Loan Agreement. *Adv. Compl.* ¶ 47. Specifically, Plaintiffs assert that Defendants converted a portion of their pre-petition First Out Term Loan into Roll-Up Loans while, at the same time, reducing their respective Pre-petition First Out Term Loan indebtedness.

15

*Adv. Compl*. ¶¶ 48-49. Plaintiffs contend that Defendants' conduct was improper and performed with the knowledge and intent of damaging the Plaintiffs. *Id*. However, Plaintiffs do not allege that their claim is predicated on conduct distinct from that underlying the alleged breach of contract claim identified in Count I. As Defendants argue, under New York law, Plaintiffs' may not "repackage" a breach of contract claim under alternative legal theories. *Defendants' Motion*, 21 (citing *Art Cap. Grp., LLC v. Carlyle Inv. Mgmt. LLC*, 151 A.D.3d 604, 605 (1st Dept 2017)). Indeed, it is well-settled New York law that a claim for breach of an implied covenant of good faith and fair dealing fails where it is based on the same conduct and seeks the same damages as the accompanying breach of contract claim. *See*, *e.g. Embarq, L.L.C. v. Bank of New York Mellon Tr. Co., N.A.*, 242 A.D.3d 569, 572 (1st Dept 2025) (dismissing a counterclaim for breach of the implied covenant of good faith and fair dealing as duplicative of the breach of contract counterclaim); *269 W. 87th St. Apartment Corp. v. QSB 267 Prop. Co, LLC*, 88 Misc. 3d 1246(A) (Sup. Ct. 2026) (same). Because Plaintiffs' breach of implied covenant claim is bottomed on the same allegations and seeks the same damages as the breach of contract claim, Count II fails as a matter of law.

As discussed above, Plaintiffs rely upon a portion of Judge Goldblatt's discourse in *American Tire*, to buttress their position that through pursuing the roll-up, Defendants have schemed to evade their contractual obligation under the Pre-petition Loan Agreement. Notably, however, as Defendants point out, Plaintiffs' argument ignores key context: in *American Tire*, the excluded minority lenders were not permitted to participate in the DIP financing and consequently, had no opportunity to obtain the benefits of the DIP loan in exchange for offering new money. *Defendants' Motion*, 8. In the instant matter, Plaintiffs were offered the right to participate in the Roll-Up Loans on equal terms—as were all other similarly situated creditors. *See* Hrg. Tr. 76:19-

16

77-12; 78:19-79:10 (March 18, 2026), ECF No. 20[11]. And, more significantly, in approving the DIP Loan, this Court expressly ruled that the agreement was "negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties." *Final DIP Order*, 23. This reflects good faith and fair dealing and as such, this Court chooses not to infer otherwise.

Without more factual underpinnings demonstrating wrongful conduct apart from simply engaging with Debtors in advancing a new money loan, Plaintiffs have not put forward a plausible claim for breach of the implied covenant of good faith and fair dealing. Finally, as discussed, the Court does not find that Defendants committed a breach of the Pre-petition Loan Agreement. Mere participation in a roll-up transaction does not violate the agreement's express terms and, in particular, receipt of the Roll-Up Loans did not result in a "payment or reduction" of debt that would have triggered obligations under the Pre-petition Loan Agreement. "A claim for breach of implied covenant of good faith and fair dealing may not be used as a substitute for a non-viable claim of breach of contract." *Smile Train, Inc. v. Ferris Consulting Corp.*, 117 A.D.3d 629, 630 (1st Dept 2014) (citations omitted). Because Plaintiffs' claim for breach of contract is not viable, its claim for breach of implied covenant of good faith and fair dealing—which is wholly bottomed on its breach of contract claim—likewise fails.

Nevertheless, should Plaintiffs—through further discovery—be able to articulate and substantiate the alleged scheme in which Defendants purportedly participated through conduct distinct from that underlying the breach of contract claim, the Court will consider such allegations at that time. Accordingly, Count II of the Adversary Complaint is dismissed without prejudice.

---

[11] Plaintiffs argue that participation in the DIP came with attendant conditions and restrictions and that the equal participation "is a factual issue outside the allegations in the [Adversary] complaint and so cannot be the basis for a motion to dismiss." *Plaintiffs' Opp*. 25 (citations omitted). Notwithstanding, the pleadings offer little more than a recharacterization of the alleged breach of contract claim asserted in Count I and fail to provide a factual predicate to support a plausible claim for breach of the implied covenant of good faith and fair dealing.

17

### C.  Count III

Plaintiffs seek a declaratory judgment that Defendants must share pro rata future payments received on their Roll-Up Loans, including through the Debtors' asset sales. *Adv. Compl.*, ¶ 55; *Plaintiffs' Opp*. 25. The Declaratory Judgment Act provides that, "in a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "The standards for determining whether a particular declaratory-judgment action satisfies the case-or-controversy [test is] whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant relief . . . ." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 118 (2007) (internal quotations marked omitted).

Here, the Court agrees that the nature of Plaintiffs' declaratory judgment claim is premised on payments or reductions that they may receive in the future and, on that basis, concludes that Plaintiffs' declaratory judgement claim is not duplicative of Plaintiffs' contract claims, which are directed at the alleged payments or reductions that Defendants received through entry into and participation in the Roll-Up Loans. *Plaintiffs' Opp*. 25-26. Nothing in the pleadings or incorporated documents before the Court, or the legal arguments presented, demonstrate that the Defendants' pre-petition loans to the Debtors have been released, satisfied or discharged[12]; rather, one can plausibly view the obligations as having been merged into the Roll-Up Loans and arguably will be satisfied (in whole or part) through subsequent payment on the Roll-up Loans[13]. Moreover, the

---

[12]  As all Parties concede, under the DIP Credit Agreement, $150,000,000 of Defendants' First Out Term Loans were "converted into and exchanged for Roll-Up Loans," and "shall satisfy and discharge" $150,000,000 of those First Out Term Loans …"without constituting a novation." DIP Loan § 2.1(b).

[13] Plaintiffs recognize as much, stating that, "[e]ven putting aside whether the Roll-Up Loans themselves are a 'payment or reduction' of debt, Defendants will receive substantial funds beyond repayment of the New-Money Loans under the DIP Facility through the Debtors' asset sales. At the very least, those

18

Pre-petition Loan Agreement provides for specific exceptions as to what may constitute a "payment" but fails to include any reference to satisfaction of roll-up obligations. As noted by Plaintiffs, "[b]ecause the parties knew that the [Debtors] might file for bankruptcy, they would have included an exception for roll-up loans in bankruptcy from pro rata sharing among the other express exceptions in the Sharing Provision if one were intended." *Plaintiffs' Opp.* 27; *see also id*. at 18.

Resolution of the Plaintiffs' claim, however, requires a determination of the economic value attributable to the roll-up feature of the DIP Loans, including any other consideration associated with the additional risk and cost of new money. A roll-up of pre-petition loans is a negotiated undertaking by a debtor, in favor of a lender, that must have an associated economic cost and value. The central question to be resolved is fixing the dollar amount for such value, and whether (as well as to what extent if any) such value should be shared with lenders who did not participate in the roll-up transaction. Further discovery, and possibly expert analysis, is therefore necessary to determine the amounts, if any, subject to pro-rata sharing. Although the eventual satisfaction of the DIP Loan and Roll-Up Loans may constitute "payment",[14] the extent to which any such payment must be shared remains to be determined. Accordingly, Count III of the Adversary Complaint survives dismissal as a plausible claim.

---

forthcoming payments must be shared ratably with Plaintiffs as 'payments or reductions' in connection with the original loans." *Plaintiffs' Opp.* 18; *see also Adv. Compl.* ¶¶ 51-57 (seeking declaratory judgment as to future payments under the Roll-Up Loans).

[14] Again, as noted in footnote 10, *supra*, the Court understands that there now have been closings with respect to the approved sales of Debtors' assets, and proceeds have been used to reduce the DIP Loan. To the extent such actions warrant amendments to Count III or other aspects of the Complaint, Plaintiffs should pursue same consistent with the Federal Rules of Civil Procedure.

19

## VI.    Conclusion

Based on the foregoing, this Court partially grants and partially denies the Defendants' Motion to Dismiss. Count I is dismissed with prejudice, Count II is dismissed without prejudice, and Count III survives as a plausible claim. Defendants are directed to submit an appropriate Order.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: May 11, 2026

20